IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| COLLEEN H.A. SULLIVAN, individually and as Trustee of her Trust Agreement dated November 27, 1979,<br><br>Plaintiff,<br><br>vs.<br><br>ELLIOT H. LODEN,<br><br>Defendant. | Case No. 21-cv-123-DKW-RT<br><br>**ORDER (1) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT I AND (2) GRANTING DEFENDANT'S EX PARTE MOTION TO SEAL EXHIBITS 7 AND 8 TO DEFENDANT'S CONCISE STATEMENT OF FACTS** |

Plaintiff Colleen Sullivan is the daughter of the late Joanna Sullivan, matriarch of the Foodland Super Market family business.  Colleen asserts a claim of legal malpractice (Count I) against Joanna's longtime estate planning attorney, Defendant Elliot Loden, arising out of a 2011–2012 valuation of Foodland stock that Loden performed in the course of his work for Joanna.  Colleen claims the valuation was inaccurate, and that Joanna relied on it to the detriment of Colleen's inheritance.

Loden now moves for summary judgment on the malpractice claim, asserting that Colleen, who was never his client, lacks standing to bring this claim because he did not owe her a duty of care.  Loden additionally asserts that Colleen

is collaterally estopped from bringing her claim because the IRS thrice "accepted" his valuation.

Neither of Loden's bases for summary judgment has merit. *First*, there is at least a genuine issue of material fact as to whether Loden owed Colleen a duty of care as an intended beneficiary of the stock valuation. *Second*, collateral estoppel does not apply because Colleen was not a party nor in privity with any party to any IRS adjudication of the validity of the valuation. Thus, summary judgment as to Count I[1] is DENIED.

## LEGAL STANDARD

A court must grant a motion for summary judgment if "the evidence in the record" and "all reasonable inferences from that evidence," when viewed in the light most favorable to the non-moving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005). The movant "bears the initial burden of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "To survive summary judgment, a plaintiff must set forth non-speculative evidence

---

[1] Along with her malpractice claim, Colleen asserts a claim of breach of fiduciary duty (Count II) arising out of Loden's work as Personal Representative of Joanna's estate after Joanna's death. Count II is not at issue in this motion.

of specific facts," *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061

(9th Cir. 2011), showing there is a "genuine issue for trial." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## RELEVANT UNDISPUTED MATERIAL FACTS AND PROCEDURAL BACKGROUND

**I.      Joanna transfers assets to her four children via gift and bequest.**

In 1948, Joanna L. Sullivan ("Joanna"), together with her husband Maurice

J. Sullivan ("Sully"), founded Foodland Super Market, the first modern-style

grocery store chain in Hawai'i.[2]  Defendant's Concise Statement of Facts (DCSF)

¶¶ 4–5, Dkt. No. 58; Plaintiff's Concise Statement of Facts (PCSF) ¶¶ 4–5, Dkt.

No. 84.  Joanna and Sully had four children: Plaintiff Colleen H.A. Sullivan

("Colleen"), Maureen Jenai Sullivan Wall ("Jenai"), Kathleen W.A. Sullivan Wo

("Kitty"), and Patrick J. Sullivan ("Patrick").  DCSF ¶ 4; PCSF ¶ 4; Complaint

¶¶ 4–6, Dkt. No. 1.  Sully died on February 28, 1998.  DCSF ¶ 4.

Since 2001, of the four Sullivan children, only Jenai and Kitty have been

directly involved with the family businesses.[3]  DCSF ¶¶ 6, 10; PCSF ¶¶ 6, 10;

Declaration of Elliot Loden ("Loden Dec. 2016 Decl.") ¶ 10, Dkt. No. 58-16.  In

---

[2]Along with Foodland, Joanna and Sully founded several other companies and a charitable foundation.  DCSF ¶ 4; PCSF ¶ 4; Complaint ¶¶ 9–11, Dkt. No. 1; Answer ¶¶ 8–9, Dkt. No. 9.
[3]Jenai was (and still is) the CEO of Foodland, and Kitty worked closely with Joanna in operating the Sullivan Family Foundation.  DCSF ¶ 10; PCSF ¶ 10; Declaration of Elliot Loden ("Loden Dec. 2016 Decl.") ¶ 11; Declaration of Maureen Jenai Sullivan Wall ("Jenai Decl.") ¶ 2, Dkt. No. 86-3.  Colleen and Patrick sold their Foodland common shares to Joanna, Jenai, and/or Kitty in 2001.  DCSF ¶ 6; PCSF ¶ 6.

late 2011 and early 2012, Joanna transferred her Foodland stock—221 common shares—to Jenai and Kitty to be divided equally between them.[4]  DCSF ¶¶ 7, 10; PCSF ¶¶ 7, 10.

Joanna reported the stock gift to the IRS by filing 2011 and 2012 Form 709 gift tax returns prepared by her longtime attorney, Defendant Elliot Loden ("Loden").[5]  DCSF ¶¶ 11–12; PCSF ¶¶ 11–12.  In order to report the value of the gift, Loden performed two appraisals of Foodland stock (the "Appraisals"): one on July 27, 2012 as of year-end 2011, and one on April 15, 2013 as of year-end 2012.  The Appraisals valued the stock at $6,152.88 per share for a total gift of $679,350.00 to each daughter.[6]  *See* DCSF Ex. 7 at 4–7, Dkt. No. 58-9 and DCSF Ex. 8 at 4, 8–9, Dkt. No. 58-10 (showing gifts of $13,598.00, $639,100.00, and $26,652.00 each to Jenai and Kitty).  The IRS did not require any changes to the Form 709 returns.[7]  DCSF ¶ 18; PCSF ¶ 18.

Joanna died on September 2, 2015, leaving an estate worth approximately $192 million.  DCSF ¶ 3; PCSF ¶ 3.  Her estate plan—a trust dated August 15,

---

[4]For tax purposes, the stock gift was spread over two calendar years, taking place on December 23, 2011, December 28, 2011, and January 3, 2012.  Defendant's Motion at 7, Dkt. No. 57-1; DCSF Ex. 7 at 4–7, Dkt. No. 58-9; DCSF Ex. 8 at 4, 8–9, Dkt. No. 58-10.
[5]Loden served as Joanna's attorney for various tax and estate planning purposes for over thirty-two years until Joanna's death in 2015.  DCSF ¶ 2; PCSF ¶ 2; Declaration of Elliot Loden ("Loden Jan. 2022 Decl.") ¶ 8, Dkt. No. 58-1.
[6]The Appraisals valued 100% of Foodland at approximately $8,500,000.00.  At the time, the company had 1,036 outstanding common shares of which Joanna owned 21.33%.  Loden Dec. 2016 Decl. ¶ 11.
[7]Loden says the IRS "accepted" the Appraisals.  DCSF ¶ 18.  Colleen disputes that characterization.  PCSF ¶ 18.

4

2013, and a pour-over will[8]—provided for equal division of the majority of her assets among her four children with certain exceptions, including a cash bequest of $1 million each to only Colleen and Patrick.[9]  DCSF Ex. 5 ("JLS Trust") Art. IV § 4.01(e), Dkt. No. 58-7; Loden Dec. 2016 Decl. ¶ 13; PCSF Ex. 15 ("Loden Notes") at 7, 9, Dkt. No. 84-18.

Loden was named Personal Representative of the estate, *see* JLS Trust at 3, and probate was opened in the First Circuit Court for the State of Hawai'i on October 22, 2015.  Defendant's Motion at 10, Dkt. No. 57-1; *Estate of Joanna Lau Sullivan*, P. No. 15-1-0698, Dkt. Nos. 1–6 (Haw. Prob. Ct. Oct. 22, 2015).

In 2016, Loden filed a Form 706 federal estate tax return on behalf of the estate.  DCSF ¶ 18; PCSF ¶ 18; Declaration of Elliot Loden ("Loden Jan. 2022 Decl.") ¶ 27, Dkt. No. 58-1.  The IRS initiated an audit of the Form 706 return on July 6, 2017 and issued a closing "Account Transcript" on September 14, 2018, indicating that no adjustment was needed.  DCSF ¶¶ 20–21; PCSF ¶¶ 20–21; Loden Jan. 2022 Decl. ¶¶ 28–30; DCSF Ex. 10, Dkt. No. 58-12; DCSF Ex. 11, Dkt. No. 58-13.  The State of Hawai'i Department of Taxation also performed an

---

[8]Joanna's trust was created on August 5, 1986, amended in its entirety on March 7, 1994, and again amended in its entirety on August 15, 2013.  Defendant's Motion at 15, Dkt. No. 57-1; Answer ¶ 11.  Her will was executed on February 28, 2008.  *Ibid.*; DCSF ¶ 13; PCSF ¶ 13.  All documents were prepared by Loden.  Answer ¶ 11.

[9]Other transfers included various cash bequests to Joanna's five grandchildren (Jenai's and Kitty's children), certain McDonald's stock in equal parts to the four children, certain real estate in equal parts to the four children, and the residuary estate in equal parts to the four children.  *See* JLS Trust, Art. IV § 4.01(b)–(k).

audit of the estate tax return, which was closed on August 27, 2018, similarly

without adjustment.  DCSF ¶ 22; PCSF ¶ 22; Loden Jan. 2022 Decl. ¶ 31; DCSF

Ex. 12, Dkt. No. 58-14.

## II.   Colleen expresses concern that her mother's testamentary intent was frustrated by faulty legal advice, and she pursues corrective action.

Colleen first learned about the 2011–2012 stock gifts to Jenai and Kitty in

November 2015 after her mother's death.  PCSF ¶ 28; Defendant's Separate

Concise Statement of Facts ("DSCSF") ¶ 28, Dkt. No. 87.  Since then, Colleen has

challenged the value assigned to the gifts by the Appraisals, along with the role she

believes that value played in her mother's 2013 estate plan.  Colleen asserts that

her mother intended to treat her four children "more or less equally" in the

disposition of her assets: if Joanna made a significant gift to one child, she would

"equalize" it by giving a gift of commensurate value to the other children.  *See*

PCSF ¶¶ 23–26; PCSF Ex. 5 at 1, Dkt. No. 84-8.  Colleen alleges that Joanna

relied on the Appraisals in deciding how much of an equalizing gift to leave to

Colleen and Patrick.  PCSF ¶¶ 24–25, 27.  She claims Loden's Appraisals far

undervalued the 2011–2012 stock gift to Jenai and Kitty,[10] resulting in Joanna

---

[10]In 2001, Colleen sold 177 shares of Foodland stock to Joanna for $4,500,000.00, a market value of $25,423.73 per share. *See* PCSF Ex. 14 at 4, Dkt. No. 84-17; Colleen Decl. ¶ 9.  Patrick sold his shares for a similar price.  *Id.*

unwittingly leaving Colleen and Patrick a lesser gift than Joanna would have if she had known the true economic value of the stock gift.  *Id.* ¶ 30.

In September 2016, through counsel, Colleen expressed her concern to Loden that Joanna had "received and relied upon false information that was material to her estate plan in attempting to equalize gifts among her children." PCSF Ex. 5 at 2; *see generally* PCSF Exs. 5–8, Dkt. Nos. 84-8–11.  She asked Loden to obtain a corrected valuation in order to "reallocate the residue of assets in Joanna's estate and/or trust if necessary to correct any imbalance in gifts among the children."  PCSF Ex. 5 at 2–3.

Colleen also requested that Loden voluntarily assign a neutral special administrator to obtain the new valuation because Loden had a conflict of interest in investigating his *own* Appraisals and evaluating the extent to which a malpractice claim may lie *against himself.  Id.*  She warned that a failure to correct the valuation and consequent gifts might leave Loden open to other causes of action, such as a breach of fiduciary duty.  *Id.*; *see* Haw. Rev. Stat. § 560:3-614(2) (authorizing appointment of a special administrator "when necessary to preserve [an] estate or to secure its proper administration including . . . in circumstances where a general personal representative cannot or should not act" in any particular respect, such as when a conflict of interest exists).

In response, Loden defended the Appraisals' reliability and accuracy,[11] denied that there was a conflict of interest, and refused Colleen's request to assign a special administrator to perform a new valuation.  *See* PCSF Exs. 6, 8.  He also denied that Joanna relied on the Appraisals in divvying up her assets.  *Id.*[12]  He claimed Joanna asked him to value the stock gift in the course of maximizing what she could give away under the unified tax credit exemption, thereby minimizing the estate's tax burden.[13]

Loden's response caused Colleen to petition the Probate Court on November 3, 2016 to intervene and order a special administrator to evaluate the Appraisals. DCSF ¶ 14; PCSF ¶ 14; PCSF Ex. 9 ¶¶ 26–32, Dkt. No. 84-12.  The Probate Court denied the petition, and Colleen appealed.  DCSF ¶¶ 15–16; PCSF ¶¶ 15–16.

---

[11]Loden attributes the low value of the Foodland stock to the subprime mortgage crisis of 2008, Foodland's operating losses from 2008 to 2011, and increased market competition around the time he prepared the Appraisals.  Defendant's Motion at 6; Loden Notes at 4.

[12]Loden continuing to serve as Personal Representative after being alerted of Colleen's malpractice claim forms the basis for her claim of breach of fiduciary duty.  *See* Complaint ¶¶ 51–56 (Count II); *see also Estate of Sullivan*, 463 P.3d 1249–50, 1256–57 (Haw. Ct. App. 2020) (holding (1) a personal representative has a duty to evaluate whether beneficiaries possess any legally cognizable claims that may impact the estate; (2) a personal representative "cannot properly administer an estate with respect to evaluating issues related to a legally cognizable claim against the personal representative himself because his self-interest creates a conflict with his fiduciary duties to the estate"; (3) Colleen had a legally cognizable malpractice claim against Loden; and (4) "Loden's self-interest [wa]s clearly in conflict with his fiduciary duties as the Personal Representative of the Estate in evaluating and acting on [the claim]").

[13]The unified tax credit exemption allows a person to pass a certain amount of assets to donees without paying gift or estate tax.  Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111–312 (Dec. 17, 2010) at 124 Stat. 3301–3304.

On March 20, 2020, the Intermediate Court of Appeals ("ICA") vacated the

Probate Court's decision and remanded for appointment of a special administrator.

*Estate of Sullivan*, 463 P.3d at 1249–50.  The ICA held that the Probate Court had

abused its discretion in denying the petition because Loden had a conflict of

interest and should not act on behalf of the estate with respect to Colleen's

malpractice claim against him.  *Id.* at 1255–57.

On remand, on February 16, 2021, the Probate Court issued an order

appointing Mark Murakami, Esq. as Special Administrator and empowering him:

1) To determine whether the process used by [Loden] to value the interests . . . that were gifted by [Joanna] to [Jenai] and [Kitty] in 2011 and 2012 was trustworthy, comported with appropriate standards applicable for business valuations of these limited partnership interests,[14] including factors set forth IRS Revenue Rule 59-60 and its progeny, and properly performed; and

2) If deemed appropriate by the Special Administrator, [to] . . . obtain an independent valuation of the limited partnership interests as of the dates the gifts were made.

PCSF Ex. 12 at 2, Dkt. No. 84-15.

On February 1, 2022, Murakami published his report, finding that the

Appraisals were "not performed according to applicable standards"—the

applicable standards being IRS Revenue Rule 59-60 and the Uniform Standards of

---

[14]The stock gift was effectuated through a limited partnership.  Joanna first transferred her Foodland shares to the Joanna Lau Sullivan Family Limited Partnership and then transferred the limited partnership interests to Jenai and Kitty.  DCSF ¶¶ 7, 10; PCSF ¶¶ 7, 10.

Professional Appraisal Practice[15]—were "therefore unreliable" and "not trustworthy," and "did [not] reflect the actual value of the estate." Special Administrator's Report at 1–2, 10, 14, Dkt. No. 84-17. Murakami based his opinion on Loden's methodology and failure to consider "those component[s] of value that would have tended to increase the value of [the] estate."[16] *Id.* at 12.

Murakami did not direct the preparation of a new valuation because he thought it would be costly and "not dispositive of the dispute since one party or the other would disagree with that valuation," *see id.* at 2 n.1. Nonetheless, he stated that a reliable valuation would be material to Colleen's malpractice claim:

> If [Joanna's] intent was to pay less gift/estate tax, then her intent was fulfilled, but perhaps at the cost of equal treatment of her children. If her intent was equal division to her children, then that intent may not have been effectuated, but the [*sic*] I, and the Court, cannot know without a reliable valuation.

*Id.* at 14–15.[17]

---

[15]IRS Revenue Rule 59-60 was promulgated by the IRS to provide guidance for valuating closely held businesses for the purpose of gift and estate tax valuations. Special Administrator's Report at 7, Dkt. No. 84-17. USPAP is a set of widely-recognized appraisal principles that govern the preparation of appraisals for use in the valuation industry and in litigation. *Id.* at 9.

[16]Loden employed a "book value" approach, rather than a market value or income valuation approach, which did not account for "the viability or decisions about Foodland going forward," including whether there were potential buyers or an intention to sell, and annual budgets and business plans. *Id.* at 5–6. Murakami noted that his opinion was not changed by virtue of the 2018 audit results from the IRS and Hawai'i Department of Taxation. *Id.* at 1–2.

[17]On February 10, 2022, Colleen petitioned the Probate Court to instruct Murakami to obtain a trustworthy valuation. PCSF Ex. 21 ¶¶ 12–19, Dkt. No. 84-24. After oral argument on April 14, 2022, the Probate Court denied Colleen's petition, finding that Colleen had not shown that a new valuation was in the best interest of the Estate, and finding that the purpose of a special administrator is not to "resolve" any claims against the Personal Representative. *Estate of Joanna Lau Sullivan*, P. No. 15-1-0698, Dkt. No. 122 (Haw. Prob. Ct. Apr. 14, 2022).

### III.   Colleen asserts a cause of action against Loden for legal malpractice.

On March 5, 2021, Colleen initiated this action asserting a claim of legal malpractice against Loden for misadvising Joanna of the value of the 2011–2012 Foodland stock gift to Jenai and Kitty, thereby reducing Colleen's compensatory gift in Joanna's final estate plan.  She claims Loden shirked his professional duty[18] either to value the stock gift correctly or to apprise Joanna of the Appraisals' limited utility for non-tax related purposes.[19]  Complaint ¶¶ 43–50; *see also* Declaration of Richard Campbell ¶13 (purported expert in estate planning for high-net worth clients opining that Loden violated professional rules of conduct by failing to advise Joanna "that she should not rely on the 2011 and 2012 Appraisals in determining the amount of off-setting cash gifts to give to Colleen and [Patrick]

---

[18]The Hawai'i Rules of Professional Conduct ("HRPC"), which mirror the Model Rules of Professional Conduct of the American Bar Association ("MRPC"), set the following expectations for lawyers:

> Competence: A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation. . . .

> Communication: A lawyer shall . . . reasonably consult with the client about the means by which the client's objectives are to be accomplished . . . , [and] explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

HRPC 1.1, 1.4; MRPC 1.1, 1.4.

[19]*See* Special Administrator's Report at 1–2, 10, 14 (finding that the Appraisals' valuation was "unreliable" and "did [not] reflect the actual value of the estate" while not "definitively stat[ing] that [the] valuation inaccurately valued the estate"); Loden Deposition Transcript at 65:16–66:10, Dkt. No. 84-5 (explaining that the purpose of the Appraisals was "[t]o file a gift tax return that would be accepted by the IRS," *not* "to let Joanna know the economic value of her stock gift" or "the true worth of the stock that she was gifting").

to carry out her intent to divide her estate more or less equally among her children").

Colleen brings her claim under both negligence and contract theories. *Id.* For negligence, she asserts: (1) Loden's Appraisal significantly undervalued the stock gift; (2) Loden owed Colleen a duty of care as an intended beneficiary of his attorney-client relationship with Joanna as it pertained to the Appraisals; (3) Loden breached that duty by negligently providing the inaccurate Appraisals to Joanna, which he "knew or should have known . . . [were] critical to [her] estate plan and her intended purpose" of treating her four children "more or less equally"; and (4) such breach injured Colleen by causing Joanna to leave her a lesser specific bequest than Joanna otherwise would have. *See id.* For her contract theory, Colleen asserts that Loden's conduct amounted to a breach of his contract with Joanna, and that she, Colleen, was injured as a third-party beneficiary. *See id.*

## IV.   Loden moves for summary judgment on the malpractice claim, contending that Colleen lacks standing because he owed her no duty of care as a non-client.

On February 22, 2022, Loden filed the instant Motion for Summary Judgment, claiming that he did not owe a duty to Colleen—that she was not an intended beneficiary of his attorney-client relationship with Joanna as it pertained to the Appraisals because the Appraisals were prepared for the sole purpose of ascertaining and reporting to the IRS the fair market value of the stock gift to

reduce Joanna's taxable estate, "not advice to allocate assets among her children." Defendant's Motion at 3, 6, 20.  Thus, he asserts that the Appraisals "[were] not intended to affect [Colleen]," "[t]here is no connection between the [Appraisals] and [Colleen]'s alleged injury," and "[t]here is no proof [Joanna] relied on [the Appraisals] whatsoever in making gifts or in determining how to distribute her assets at death."  Dkt. No. 86 at 4–5.  In the alternative, Loden contends that collateral estoppel bars Colleen's claim because the IRS "accepted and approved the [Appraisals] on three different occasions."  Defendant's Motion at 24.

Colleen opposed the Motion for Summary Judgment on March 28, 2022, Dkt. No. 84, and Loden replied on April 4, 2022.  Dkt. No. 86.  The Court heard oral argument on April 18, 2022, *see* Dkt. No. 92, and this Order follows.

## DISCUSSION

### I.     There is at least a genuine issue of material fact as to whether Loden owed Colleen a duty, precluding summary judgment on standing.

In *Blair v. Ing*, 21 P.3d 452, 464 (Haw. 2001), the Hawai'i Supreme Court held that a non-client may sue an attorney for malpractice in an estate planning case if "the relationship between [the] attorney and [the] non-client is "such that [the law] would recognize a duty of care."  In deciding whether to recognize such a duty in a given case, six factors must be considered: "(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to [her]; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness

of the connection between the defendant's conduct and the injury; (5) the policy of preventing future harm; and (6) whether imposing liability place[s] an undue burden upon the legal profession."[20] *Id.* at 459, 464–65 (citing *Lucas v. Hamm*, 364 P.2d 685, 687–88 (Cal. 1961)).

Here, Loden has not carried his burden of showing that, taking "the evidence in the record" and "all reasonable inferences" therefrom in the light most favorable to Colleen, the six *Blair* factors weigh against recognizing a duty of care to Colleen.  *See* Fed. R. Civ. P. 56(a); *Genzler*, 410 F.3d at 636; *Soremekun*, 509 F.3d at 984.  Much of the *Blair* analysis here depends on whether Colleen was an intended beneficiary of the Appraisals.  There is no doubt that she was. Defendant's Motion at 20 ("[T]he beneficiary of [the A]ppraisal was . . . all of the children equally."); *see also Estate of Sullivan*, 463 P.3d at 1254 ("[I]t is undisputed that, as a beneficiary of the Trust and a devisee of the Estate, as well as a child of [Joanna], Colleen is an interested person."); Answer ¶ 41 ("Defendant Loden admits that [Colleen] is a beneficiary of [Joanna]'s Estate, individually.").

The Appraisals were important to all four children because the evidence in the light most favorable to Colleen, the non-moving party, shows that Joanna intended to treat all four children "more or less equally," that Loden was aware of

---

[20]The question of whether a plaintiff can *recover* for malpractice is distinct from whether she has *standing to sue*.

that desire, and that the Appraisals were a means for Joanna to fulfill that intent.

For instance, the evidence shows that Joanna and Sully had a longstanding practice

of treating their four children equitably, if not exactly equally:

- On their sixteenth birthdays, Sully gave each of his four children a Norman Rockwell painting.  Declaration of Colleen H. Sullivan ("Colleen Decl.") ¶ 6, Dkt. No. 84-2.[21]

- Around 1990, Jenai wanted to sell some of her McDonald's shares.  Joanna and Sully insisted that each of the other siblings sell a similar number of shares so that the four children would each retain equal ownership of McDonald's stock.  *Id.* ¶ 5.

- After Sully's 1998 death, as a result of various inheritances, each of the four children owned exactly the same number of shares in the family companies, including 25% of Pacific Warehouse and Kalama Beach, 18.75% of Food Pantry, 17.43% of Foodland, 12% of the Sullivan Family Limited Partnership, and 25% of KJCP, LLP, the general partner of the Sullivan Family Limited Partnership.  *Id.* ¶ 6.

- In 2011 and 2012, Joanna gifted almost exactly $500,000 to each of the four children and/or their issue: $166,666 each to Jenai and Jenai's two children (totaling $499,998), $125,000 each to Kitty and Kitty's three children, (totaling $500,000), and $500,000 each to Colleen and Patrick (who have no children).  Dkt. No. 83 at 5 n.2.

The Sullivans' intention of equitable treatment, including in their estate

planning, was common knowledge among the family members:

---

[21]Loden equates the "self-serving" nature of Colleen's declaration with "speculation." *See, e.g.*, Defendant's Motion at 21–22 (stating Colleen's claim is "based on pure conjecture and speculation that Joanna would have given [her] more if the Appraisal [had come] out differently"); *see Cafasso*, 637 F.3d at 1061 (requiring plaintiff's evidence to be "non-speculative" and "specific").  Declarative evidence is not speculative simply because it is self-serving.  Even self-serving declarations *must* be considered on summary judgment. *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).

- Colleen claims, "My mother repeatedly informed me that she and my late father intended that all four of their children . . . be treated equally by our parents, including in the division of any assets upon inheritance." Colleen Decl. ¶ 11.

- Colleen claims her parents "repeatedly stated that they loved each of their children equally and wanted each of [them] to share in the Sullivan family wealth." *Id.* ¶ 4.

- Kitty claims Joanna "wanted to be fair to all of her children," though "that did not mean that everyone would receive an equal share of her estate." Declaration of Kathleen Weng Ai Sullivan Wo ("Kitty Decl.") ¶ 6, Dkt. No. 86-4.

- Jenai claims Joanna told her that "different children might get different things, but that she would be fair." Declaration of Maureen Jenai Sullivan Wall ("Jenai Decl.") ¶ 5, Dkt. No. 86-3.

Further, the record contains evidence that Loden, Joanna's estate planning attorney of over thirty-two years, knew of Joanna's intention to treat the children in this manner in her estate plan, and that both he and Joanna saw it as his role to assist Joanna in that pursuit:

- Loden admits that "[Joanna] annually discussed [with him] her decisions with regard to gifts that she gave to her children and grandchildren while she was alive." Loden Dec. 2016 Decl. ¶ 5.

- Loden concedes that although Joanna never told him "that she wanted to treat her children or grandchildren exactly equal[ly] with regard to her gifts," he understood her intention was to be "equitable among them as donees." *Id.*

- Colleen claims Loden told her in July 2011 that the distribution of Joanna's estate was to be "all fair, all even, all fair." Colleen Decl. ¶ 11.

16

- Colleen claims Joanna often told her that if she had questions about her mother's intention to treat her children equally, including in the division of assets upon inheritance, she should "talk to Mr. Loden." *Id.*

Finally, there is evidence that Joanna specifically bequeathed $1 million to Colleen and Patrick in order to compensate for the appraised stock gift to Jenai and Kitty:

- Loden valued the stock gift at $679,350 each to Jenai and Kitty on April 15, 2013, *see* DCSF Exs. 7–8, just four months before Joanna finalized her August 2013 estate plan incorporating a $1 million cash bequest to Colleen and Patrick, but not Jenai and Kitty. *See* JLS Trust, Art. IV § 4.01(e).

- Of Joanna's $192 million estate, the $1 million bequest to Colleen and Patrick was one of the only transfers that was not exactly equally divided among the four children. *See id.*, Art. IV § 4.01(b)–(k); *see also* Loden Notes at 3 ("Thus, at Joanna's death, the entire gross estate of $191,550,000.00 . . . passes equally to the four children, except for a specific bequest of $1 million cash to each of the two siblings, Colleen Sullivan and Patrick Sullivan, and about $4.9 million in generation skipping cash gifts to Joanna's five grandchildren.").

- Colleen claims, "Kitty and Mr. Loden informed me at [a November 13, 2015] meeting, that, contrary to my understanding, neither Patrick nor I were to inherit my mother's Foodland stock because in 2011 and 2012, all of her Foodland stock had been gifted, one-half to Kitty and one-half to Jenai. . . . [Loden then said] that my mother had provided in her Trust for a separate $1,000,000 cash distribution to each of Patrick and to myself which was intended to be 'equivalent' to the previous stock gifts made to Jenai and Kitty." Colleen Decl. ¶¶ 13–14.

- Notes that appear to have been written by Loden state, "When Joanna Sullivan embarked on her estate planning, she decided not to gift the Foodland common stock shares that she owned (approximately 21%) equally to the four siblings but only to the two siblings working in the family business and working with her in the family foundation. Thus, at Joanna's death, the entire gross estate . . . passes equally to the four children, except for a specific bequest of $1 million cash to each of [Colleen and Patrick] and

about $4.9 million in generation skipping cash gifts to Joanna's five grandchildren." Loden Notes at 3 (with the word "[t]hus" indicating a connection between the stock gift and the $1 million bequest).

With this background in mind, we return to *Blair's* six factors:

1.   <u>Extent to which the Transaction was Intended to Affect the Plaintiff</u>

Loden was Joanna's longstanding estate planning attorney, having served in that capacity for decades. While the Appraisals that he performed may have benefited Joanna's tax preparation obligations, as Loden claims, doing so in the context of estate planning means limiting the estate's tax obligations in order to maximize the estate's ability to bequeath its assets. Colleen was one of the individuals who stood to benefit from the estate upon Joanna's death, and there is no doubt that Loden was aware of that. Colleen, in other words, was not "a mere incidental beneficiary who derived an indirect benefit." *See* Defendant's Motion at 20. She was an intended beneficiary of the Appraisals because, in the light most favorable to her, the Appraisals significantly affected the amount of her (and Patrick's) separate cash bequest upon Joanna's death.

2.   <u>Foreseeability of Harm to the Plaintiff</u>

To offset her substantial stock gift to Jenai and Kitty, Joanna would need to know the approximate value of that gift. The Appraisals that Loden performed accomplished that. Since Loden knew that the elder Sullivans had always treated their children, at a minimum, fairly (if not equally), Loden similarly must have

known of the significance of the Appraisals in doing just that.  Common sense

dictates as much.  In other words, if Loden's stock valuation turned out to be

"low," he must have known that Colleen and Patrick would receive a

correspondingly low gift as an offset.  Accordingly, the harm to Colleen from any

faulty appraisal he did was certainly foreseeable.

3.     Degree of Certainty that the Plaintiff Suffered Injury

        Without a trustworthy valuation, it is difficult to know whether the

Appraisals undervalued the stock gift, and thus whether Colleen's inheritance was

harmed.  *See* Special Administrator's Report at 14–15 (opining that a reliable

valuation is material to Colleen's malpractice claim).  However, there is evidence

of undervaluation.  First, the Special Administrator found that the Appraisals were

unreliable because they failed to account for "those component[s] of value that

would have tended to *increase* the value of [the] estate."  *Id.* at 12 (emphasis

added).  Further, by Loden's own account, he valued the stock gift as low as

possible for purposes of IRS reporting in order to minimize estate tax.  *See*

Defendant's Motion at 5–6.  Thus, taking the evidence in Colleen's favor, there is a

high degree of certainty that Colleen's gift was lower than it might have been.

4.     The Connection Between the Defendant's Conduct and the Injury

        Loden's conduct is very closely connected to Colleen's alleged injury.  The

Appraisals conducted by Loden served as the basis for settling on an equalizing

gift amount for Colleen and Patrick.  The Appraisals were, in other words, the direct cause of any injury.  *See Estate of Sullivan*, 463 P.3d at 1254 ("[I]mproperly low valuations [in the Appraisals] may have led [Joanna] to bequeath her other children lesser assets or amounts.").

5.    The Policy of Preventing Future Harm

Assuming damages, allowing Colleen to pursue her claim of malpractice against Loden will further Hawai'i's policy of deterring similar wrongdoing.  The Hawai'i Supreme Court has said:

> One of the main purposes [of] the transaction between [the estate planning] attorney and the testator . . . [i]s to provide for the transfer of property to the beneficiaries: . . . if persons such as the beneficiaries are not permitted to recover for the loss resulting from negligence of the draftsman, no one would be able to do so, and the policy of preventing future harm would be impaired.

*Blair*, 21 P.3d at 460 (citing *Lucas*, 364 P.2d at 688).  This is particularly true given the procedural background of this dispute in state court where Loden appears to have resisted Colleen's efforts for an independent valuation since 2016.

6.    Burden on the Legal Profession

Imposing a duty of care does not place an undue or unfair burden on the legal profession.  The duties of competence and communication, *see* HRPC Rules 1.1, 1.4; MRPC Rules 1.1, 1.4, in fact, dictate doing just that.

All six *Blair* factors weigh in favor of recognizing a duty.  Consistent with the foregoing, the Court finds that there is at least a genuine issue of material fact

as to whether Loden owed Colleen a duty of care, precluding summary judgment on standing.

## II.    Collateral estoppel does not apply.

Collateral estoppel, also known as issue preclusion, bars parties or their privies from relitigating a particular fact or issue that was actually litigated and finally decided in an earlier action.  *Dorrance v. Lee*, 976 P.2d 904, 909 (Haw. 1999).  The following elements must be met for collateral estoppel to apply: "(1) the issue decided in the prior adjudication is identical with the one presented in the action in question, (2) there was [a] final judgment on the merits, and (3) the party against whom *res judicata* is asserted was a party or in privity with a party to the prior adjudication."  *Id.*

If the prior adjudication occurred before an administrative agency, as opposed to a judicial body, the doctrine of collateral estoppel still applies if "(1) the administrative agency acts in a judicial capacity, (2) the agency resolves disputed issues of fact properly before it, and (3) the parties have an adequate opportunity to litigate."  *Spirit of Aloha Temple v. Cnty. of Maui*, 409 F. Supp. 3d 889, 902 (D. Haw. 2019) (citing *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)).  The party asserting collateral estoppel has the burden of establishing each of its elements.  *Bremer v. Weeks*, 85 P.3d 150, 161 (Haw. 2004).

Here, Loden contends that collateral estoppel bars Colleen from litigating a key factual issue in this case—that the Appraisals were inaccurate—because the IRS has already found that the Appraisals were accurate "on three different occasions." Defendant's Motion at 24 (referring to the 2011 and 2012 Form 709 gift tax returns and the 2017–2018 audit of the 2016 Form 706 estate tax return). He avers that "[t]he IRS is the ultimate arbiter of the appropriateness of Defendant's methodology and his [A]ppraisal[s]," *id.*, and "[t]he fact that the IRS accepted the [A]ppraisal[s] shows that, as a matter of law, [Loden's] methodology was adequate, reliable, and appropriate or trustworthy and comported with all standards and applicable law." *Id.* at 26.

Loden's collateral estoppel argument is unpersuasive. Although it is not clear that Loden can satisfy *any* of the elements of collateral estoppel, it suffices for current purposes to mention one: Colleen was indisputably not involved in the various IRS reviews, nor is it evident that she was in privity with anyone who was. Loden candidly conceded as much at oral argument. *See* Dkt. No. 92 (defense counsel admitting that Colleen was not a party or in privity with a party to any IRS adjudication and requesting an exception in this case).[22]

---

[22]The Court is without authority or inclination to grant such an exception from the controlling law of this state and Circuit.

22

Because Loden cannot satisfy the elements necessary for collateral estoppel, summary judgment on this basis is denied.

### III.   Loden's Motion to Seal DCSF Exhibits 7 and 8 is granted.

According to the parties' Stipulated Protective Order, either party may designate as "confidential" any document which that party considers in good faith to contain confidential business or financial information.  Dkt. No. 61 ¶ 1.  Loden has labeled Exhibits 7 and 8 to his Concise Statement of Facts as confidential because they purportedly contain financial, trade secret, and other business information.  Dkt. No. 59-1 ¶ 5.  Accordingly, Loden requests permission to file those two exhibits under seal.  *Id.* ¶¶ 7-8.

With no objection and good cause appearing, Loden's Motion to Seal Exhibit 7 (Dkt. No. 58-9) and Exhibit 8 (Dkt. No. 58-10) is granted.  *See* LR 5.2(c).

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, Defendant Elliot Loden's Motion for Summary Judgment on Count I, Dkt. No. 57, is DENIED.  Defendant's Motion to Seal Exhibits 7 and 8 of his Concise Statement of Facts, Dkt. No. 59, is GRANTED.

IT IS SO ORDERED.

DATED: May 4, 2022 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge