IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| COLLEEN H.A. SULLIVAN, individually and as Trustee of her Trust Agreement dated November 27, 1979,<br><br>Plaintiff,<br><br>vs.<br><br>ELLIOT H. LODEN,<br><br>Defendant. | Civil No. 21-00123 MWJS-RT<br><br>ORDER GRANTING DEFENDANT'S MOTION IN LIMINE NO. 1 |

## INTRODUCTION

In this lawsuit, Plaintiff Colleen Sullivan brings malpractice and breach of fiduciary duty claims against an attorney who provided estate planning services for her late mother, Joanna.  The claims arise from stock gifts that Joanna made to two of Sullivan's siblings in 2011 and 2012.  Sullivan alleges that the attorney, Defendant Elliot Loden, dramatically undervalued the gifts.  And as a result, Joanna allegedly gave Sullivan a

smaller corresponding cash gift than she would otherwise have, given Joanna's alleged desire to treat her children equally.

A jury trial is scheduled for October 15, 2024, and the parties have filed motions *in limine* seeking pretrial guidance on certain evidentiary disputes.  In Defendant's Motion *in Limine* No. 1, Loden seeks to preclude the report and testimony of Mark Murakami, an attorney who was appointed to act as a special representative in state probate court and who opined that Loden's valuations were not reliable.  ECF No. 122.  Loden also filed a supplemental memorandum in support of the motion, ECF No. 188, and Colleen filed a memorandum in opposition, ECF No. 191.  The Court held a hearing on this motion on September 24, 2024.  ECF No. 197.

For the reasons set out below, the Court GRANTS the motion.[1]

## BACKGROUND

Before turning to the merits, some background is necessary. Sullivan's late mother, Joanna, was one of the founders of the first modern-

---

[1]      Plaintiff has moved to seal Exhibit A in support of her opposition to Defendant's Motion *in Limine* No. 1.  ECF No. 190.  Because the Court concludes that the contents of Exhibit A would not alter the Court's ruling on Loden's motion *in limine*, the Court strikes Exhibit A from the opposition and denies the motion to seal as moot.

style grocery store chain in Hawai'i—Foodland Super Market—and when she passed in 2015, she left behind an estate worth approximately $192 million for her four children.  ECF No. 94, at PageID.1643-44 (Order Denying Summary Judgment).  Two of those children—Sullivan and her brother Patrick—have had no ownership interest or direct involvement in Foodland since 2001, when both sold their shares to their mother and other siblings.  *Id.* at PageID.1643 n.3.  Those siblings, Jenai and Kitty, continued to be directly involved in operating the family business and still hold shares in the company.  ECF No. 94, at PageID.1643-44, 1643 n.3; *see also* ECF No. 1, at PageID.4-5

Before her death, Joanna transferred her Foodland stock to Jenai and Kitty.  ECF No. 94, at PageID.1643-44.  And Joanna asked her longtime attorney, Loden, to prepare her Form 709 gift tax returns to report these stock gifts.  *Id.* at PageID.1644 & n.5.

At the heart of this case are two appraisals that Loden prepared, in which he valued the stock at $6,152.88 per share—for a total gift of

$679,350.00 to each of Jenai and Kitty.[2]  *Id.* at PageID.1644.  Loden relied on these appraisals in the completed Form 709 gift tax returns, and the IRS did not require any changes to those filings.  *Id.*  But Sullivan argues that Loden dramatically undervalued the stock gifts.  She further argues that she was prejudiced by Loden's error because her mother meant to treat her children equally.  Sullivan highlights that Joanna's estate plan provided for equal division of the majority of her assets among her four children—the notable exception being cash bequests of $1 million each to Sullivan and Patrick.  *Id.* at PageID.1644-45.  These cash gifts, Sullivan argues, were intended to correspond roughly to the value of the stock Joanna had previously given to Jenai and Kitty.  ECF No. 1, at PageID.14.  And, the argument goes, had Joanna known that the stock gifts to Jenai and Kitty were substantially more valuable than Loden's appraisal had suggested, Joanna would have given Sullivan and Patrick larger cash gifts.  *See* ECF No. 94, at PageID.1646.

---

[2]     Loden performed two appraisals because the stock gift was spread over two calendar years for tax purposes.  ECF No. 94, at PageID.1644 & n.4.

After Joanna passed, Loden was appointed as the personal representative of the estate, and probate was opened in the First Circuit Court for the State of Hawaiʻi.  *Id.* at PageID.1645.  At that time, Sullivan learned of the 2011-2012 stock gifts for the first time and had Loden's appraisals reviewed by a valuation expert.  ECF No. 1, at PageID.9.  She then alleged that there were reliability concerns with Loden's appraisals and demanded that he obtain a corrected valuation to "reallocate the residue of assets in Joanna's estate and/or trust if necessary to correct any imbalance in gifts among the children."  ECF No. 94, at PageID.1646-47.  Sullivan "also requested that Loden voluntarily assign a neutral special administrator to obtain the new valuation because Loden had a conflict of interest in investigating his *own* Appraisals and evaluating the extent to which a malpractice claim may lie *against himself*."  *Id.* at PageID.1647.

Loden declined to appoint a special administrator and defended the reliability of his appraisals.  *Id.* at PageID.1648.  He noted that the appraisals had been conducted in the shadow of the 2008 subprime mortgage crisis and Foodland's operating losses from 2008 to 2011.  *Id.* at

PageID.1648 & n.11.  Loden further argued that his purpose in preparing the appraisals was to support his preparation of gift tax returns, and that by not *overvaluing* the stock gift, he was able to lessen the estate's tax burden.  *Id.* at PageID.1648.  And, Loden adds, he was able to do so successfully:  the IRS did not require any changes to the gift tax returns, and after Loden filed a Form 706 federal estate tax return on behalf of the estate—which also relied on the appraisals—the IRS and the Hawaiʻi state tax office closed their audits without requiring any adjustments.  *Id.* at PageID.1644-46.

After Loden declined to appoint a special administrator to evaluate the appraisals, Sullivan petitioned the probate court to do so.  *Id.* at PageID.1648.  The probate court declined, and Sullivan appealed that decision.  The Hawaiʻi Intermediate Court of Appeals (ICA) vacated the probate court's decision and remanded for appointment of a special administrator.  *Est. of Sullivan*, 146 Hawaiʻi 591, 463 P.3d 1248 (Haw. Ct. App. 2020).  The ICA held that "a personal representative cannot properly administer an estate with respect to evaluating issues related to a legally-

6

cognizable claim against the personal representative himself because his self-interest creates a conflict with his fiduciary duties to the estate." *Id.* at 591, 463 P.3d at 1250.  Because Sullivan had a legally cognizable malpractice claim against Loden, the ICA concluded that Loden himself could not fairly evaluate the merits of that claim on behalf of the estate. *Id.* at 600, 463 P.3d at 1257.

And that brings us to the appointment of Mark Murakami, whose proposed testimony is the subject of the current motion *in limine*.  On remand, the probate court appointed Murakami to stand in for the personal representative for a limited task:  to "determine whether the process used by [Loden] to value the interests . . . that were gifted by [Joanna] to [Jenai] and [Kitty] in 2011 and 2012 was trustworthy, comported with appropriate standards applicable for business valuations of these limited partnership interests, including factors set forth [in] IRS Revenue Rule 59-60 and its progeny, and properly performed," and, if deemed appropriate by the special administrator, to "obtain an

independent valuation" of the stock gifts.  ECF No. 94, at PageID.1649 (footnote omitted).

Murakami thereafter prepared a report in which he found that Loden's appraisals were "not performed according to applicable standards," were "therefore unreliable" and "not trustworthy," and did not "reflect the actual value of the estate."  *Id.* at PageID.1649-50 (citing the Special Administrator's Report, ECF No. 84-17).  But Murakami did not obtain a new valuation because he thought it would be "costly and not dispositive of the dispute since one party or the other would disagree with that valuation."  *Id.* (cleaned up).

## DISCUSSION

Sullivan wants to call Murakami to testify at trial and to offer his report into evidence.  That testimony and report would go to show that Loden's appraisals were "not performed according to applicable standards" and were "therefore unreliable," "not trustworthy," and "did [not] reflect the actual value of the estate."  ECF No. 122-3, at PageID.1898-90, 1907.  Sullivan argues that Murakami is qualified to offer opinions as an

expert; that he should alternatively be allowed to offer lay opinions; that

his report is admissible as the report of a public office; and that his report

and expected testimony are sufficiently reliable to be admissible under the

residual exception to the hearsay rule.  In his Motion *in Limine* No. 1, Loden

challenges each of these grounds for admission.

 For the reasons below, the Court concludes that Loden has the better

of these arguments.

## A. Murakami Is Not Qualified to Testify as an Expert Witness under Federal Rule of Evidence 702

 The first question is whether Murakami qualifies as an expert under

Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
>  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>  (b) the testimony is based on sufficient facts or data;
>
>  (c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 "imposes a special obligation upon a trial judge" to ensure that proposed expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). But as Rule 702 makes clear, it is the proponent of the witness who bears the burden to "demonstrate[] to the court that it is more likely than not that" the requirements of Rule 702 have been met. Fed. R. Evid. 702.

1. In his motion *in limine*, Loden argues that Sullivan cannot meet her burden of establishing Murakami's qualifications or reliability as an expert witness. First, Loden argues that Murakami "is not qualified as an expert in the area of preparing business valuations of closely held businesses for the purpose of filing gift tax returns that will be accepted by the IRS as part of an efficient tax-planning strategy." ECF No. 122-1, at PageID.1882. Loden notes that Murakami's own law firm biography lists his practice areas as "Appeals," "Business & Commercial Law," "Construction Law," "Land Use & Eminent Domain," "Litigation & Dispute Resolution," "Real

Estate," and "Wills, Trusts & Estates."  ECF No. 122-7, at PageID.2107-2110.

But Murakami nowhere suggests that his practice focuses on—or that he

otherwise possesses expertise in—preparing valuations of closely held

businesses, let alone doing so in connection with the preparation of gift tax

returns.

Second, Loden argues that Murakami himself has acknowledged that

he is not an expert in valuation but is instead a non-expert who consulted

with actual experts to prepare a report for use in probate court.  For

example, in his deposition, when asked if he has the necessary

qualifications to be "an expert on valuations of closely-held stock for gift

and estate tax purposes," Murakami answered simply, "No."  ECF No. 188,

at PageID.2733.  Murakami also acknowledged that he has never himself

prepared a valuation of a business.  *Id.*  And Murakami made clear that to

identify the proper standards for conducting a valuation, he did not use his

own experience and expertise, but instead consulted with an actual

valuation expert who provided that information to him.  *Id.* at

PageID.2733-34 (Murakami explaining that as special administrator, he

recognized that "it would help to understand if there were industry standards," and so he "wanted to have access to a consultant that would better be able to inform that"); *id.* at PageID.2734 (Murakami explaining that he asked "an industry professional what the standards were with regard to valuations" and that professional identified the Uniform Standards of Professional Appraisal Practice).  Robert Taylor, a valuation industry professional and CPA, also confirmed in his deposition that Murakami was relying on him for his expertise in valuations of closely held stock for gift and estate tax purposes.  *Id.* at PageID.2735 (Taylor stating that "[a]t least in part as it relates to my analysis of the appraisal I would expect he would be relying upon me").

Third, Loden argues that Murakami did not use reliable principles and did not apply them in a reliable manner in preparing his report.  To begin with, Murakami did not account for the fact that "the tax authorities accepted the valuations."  ECF No. 122-1, at PageID.1883.  Or as Murakami put it, his opinion was "not changed by virtue of the IRS and Hawaii Tax Office acceptances of the valuations for their purposes."  *Id.*  Furthermore,

Loden contends that Murakami failed to account for the fact that "the financial statements used to prepare the valuation were audited by Deloitte and that the tax authorities approved the appraisal and gift tax return." *Id.* Rather than account for these material considerations, "Murakami's report simply ignores these facts and instead applies other appraisal standards not required by the IRS." *Id.*

2.  In her memorandum opposing Loden's motion *in limine*, Sullivan offers relatively little to counter these contentions.  Indeed, her discussion of Murakami's eligibility to testify as an expert witness spans a mere two paragraphs, taking up a single page of her filing.  ECF No. 191, at PageID.2850.  And there is only one sentence that affirmatively addresses the question of whether Murakami qualifies as an expert witness:  Sullivan asserts that "[t]here is no question that Murakami is a qualified trust and estate lawyer and was qualified as the appointed Special Administrator to review Loden's work to determine if the Appraisals were untrustworthy and to assess the conflict of interest." *Id.*

Sullivan appears to make two arguments:  first, that Murakami is qualified to testify as an expert about the reliability of Loden's appraisals because Murakami is a "qualified trust and estate lawyer"; and second, that Murakami should be deemed qualified because he was appointed as a special administrator by the probate court.  Neither of these arguments is persuasive.

Beginning with the first argument, Sullivan does not explain how a witness would be qualified to opine about the reliability of an appraisal merely because he is a qualified—a highly regarded, even—trust and estate lawyer.  Those two tasks *might* overlap, but Sullivan has not met her burden of showing that Murakami has specific appraisal expertise.  And, in fact, Sullivan denies that she intends to call Murakami "to testify about a business valuation," and does not suggest that he has the qualifications to do so.  ECF No. 191, at PageID.2850.[3]

---

[3]        Sullivan suggests that in disclaiming any expertise, Murakami was only conceding that he does not know how to prepare a valuation.  While that may be true, Sullivan has not shown that Murakami has sufficient expertise to testify about the *process* of preparing a valuation, either.  In preparing his probate court report, Murakami relied on the expertise of others to reach his conclusions.

Second, Sullivan suggests that Murakami's appointment in probate court weighs in favor of concluding that Murakami is an expert.  But she has provided no information in her papers or at the hearing on this motion about what qualifications, if any, are demanded of special administrators in probate court.  If appointment as a special administrator does not require any particular expertise—perhaps because the probate court simply expects special administrators to consult with actual experts where needed—then the appointment to that role cannot, in and of itself, support a finding that the appointee is an expert.

In a separate part of Sullivan's opposition (in a discussion of whether Murakami's report qualifies as a public report), Sullivan argues that "Defendant did not challenge the appointment of Murakami" as special administrator based on his lack of valuation expertise.  ECF No. 191, at PageID.2844.  But the fact that Loden may not have objected to Murakami's appointment as special administrator—which, again, was a role in which Murakami was free to consult with valuation experts—does not support

the conclusion that Murakami is qualified to testify as an expert about the reliability of valuations in federal court.

Because Sullivan has thus failed to carry her burden under Rule 702, the Court will not permit Murakami to testify as an expert.  Accordingly, the Court need not resolve a separate potential impediment to allowing Murakami to testify as an expert:  that Sullivan does not appear to have clearly noticed him as an expert in the first place.  *See* ECF No. 191-11, at PageID.2980-81 (Sullivan's Amended Rule 26(a)(1) disclosures do not explicitly identify Murakami as one of her experts, but state only that Sullivan might seek to use his report at trial, that the report itself might be admissible at trial under Rule 702, and that Sullivan generally reserved the right to call Murakami as a witness).[4]

---

[4]     Loden additionally argues that the issue of whether his appraisals were reliable "is an issue for the jury to decide in this case, not for Mr. Murakami or any other person to decide."  ECF No. 122-1, at PageID.1870.  But while it is unquestionably the jury's role to decide that issue, it is not necessarily inappropriate to allow the jury to hear evidence that, if credited, could assist them in deciding it.  Nor is there necessarily anything improper about an expert offering opinions about, say, IRS Revenue Ruling 59-60 or other relevant valuation standards.  *See, e.g., Hyer v. City & Cnty. of Honolulu*, — F. 4th—, No. 23-15335, 2024 WL 4259862, at *8 (9th Cir. 2024) (explaining the approach courts must follow in assessing whether expert witnesses are offering inadmissible legal opinions).  Ultimately, the Court need not resolve whether any of Murakami's opinions,

**B.      The Proposed Opinion Testimony Is Not Admissible as Lay Opinion Testimony under Federal Rule of Evidence 701**

Sullivan alternatively argues that Murakami should be permitted to offer lay opinion testimony.  ECF No. 191, at PageID.2846-2849.

A court may admit lay opinion testimony where it is (1) "rationally based on the perception of the witness" and (2) "helpful to the jury in acquiring a 'clear understanding of the witness' testimony or the determination of a fact in issue.'"  *United States v. Simas*, 937 F.2d 459, 464 (9th Cir. 1991) (quoting Fed. R. Evid. 701).  But opinions are "rationally based on the perception of the witness," Fed. R. Evid. 701, only when the observations are "common enough" to require a "limited amount of expertise."  *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995).

In *VonWillie*, for example, the Ninth Circuit found it a sufficiently commonsense observation for a police officer to testify, as a lay witness, about the "nexus between drug trafficking and the possession of weapons."  *Id.*  By contrast, the Ninth Circuit in *United States v. Figueroa-*

---

if qualified, would still be admissible, because the Court has found that Murakami lacks the qualifications to offer those opinions.

*Lopez*, 125 F.3d 1241, 1244-46 (9th Cir. 1997), explained that special agents'
observations of whether the defendant's actions "were consistent with
those of an experienced narcotics trafficker" required specialized
knowledge and therefore could only come from a qualified expert witness.

In this case, there is no question that Murakami's report, and
proposed testimony, require specialized knowledge.  His observations
about the reliability of Loden's appraisals cannot possibly be described as
"common enough" to "require such a limited amount of expertise" that
they can be "deemed lay witness opinion."  *VonWillie*, 59 F.3d at 929.
Murakami therefore cannot offer these opinions as a lay witness under
Rule 701.

Sullivan does not meaningfully dispute that Murakami's opinions are
the sort that require specialized knowledge, but she insists that as special
administrator, Murakami "reached his opinion based on his perception and
personal knowledge."  ECF No. 191, at PageID.2847.  But a lay witness is
not allowed to offer opinions requiring specialized knowledge just because
they have perceived relevant facts.  If that were true, then "a layperson

witnessing the removal of a bullet from a heart during an autopsy could opine as to the cause of the decedent's death." *Figueroa-Lopez*, 125 F.3d at 1246.  A witness must have specialized knowledge, and use it, to offer an opinion that requires such knowledge.

At the hearing on the motion, Sullivan argued that Murakami should at least be allowed to testify as a lay witness if the Court concludes that he is *not* an expert witness.  But this argument would "blur[] the distinction between Federal Rules of Evidence 701 and 702." *Figueroa-Lopez*, 125 F.3d at 1246.

An opinion does not transform into a lay opinion merely because a party's proposed witness lacks that specialized knowledge:  that result would encourage parties "to offer all kinds of specialized opinions without pausing first properly to establish the required qualifications of their witnesses."  *Id.*  Here, the fact that Murakami lacks the needed specialized knowledge does not change the nature of the opinions he offers.  Instead, it simply means that he is not qualified to offer those opinions as an expert.

For the foregoing reasons, Murakami is not permitted to offer his opinions about the reliability of Loden's appraisals in the form of lay opinion testimony. There is an important limit in this ruling, however. If Murakami's report were admissible for some other reason—say, for example, because it qualifies as a public report under Federal Rule of Evidence 803(8)—then it is conceivable that Murakami might be permitted to testify, as a lay witness, merely to explain matters within the report. And Sullivan does argue that the report itself is admissible on Rule 803(8) grounds, so the Court turns to that question next.

## C. Murakami's Report Is Not Admissible as a Public Report under Federal Rule of Evidence 803(8)

In arguing that Murakami's report should be admitted as a public report under Rule 803(8), Sullivan principally argues that his report is trustworthy—and that Loden has not overcome the presumption of trustworthiness that attends to public reports. ECF No. 191, at PageID.2838-46. The problem with this framing is that it largely skips over a threshold issue: whether Murakami's report is a public report in the first place. And for the reasons below, the Court concludes that it is not.

1.  Although out-of-court statements are typically excluded as hearsay, Federal Rule of Evidence 803(8) provides an exception for public reports.  The exception covers a "record or statement of a public office" when certain requirements are met.  Fed. R. Evid. 803(8).  As relevant here, those requirements include that the record or statement must "set[] out" the "factual findings from a legally authorized investigation."  Fed. R. Evid. 803(8)(A)(iii).  If the proponent of the report satisfies those requirements, it then becomes the opponent's burden to "show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8) (B).

In many cases, there is no question that a record or statement is—or is not—that of a public office.  Take *In re Aircrash in Bali*, 871 F.2d 812 (9th Cir. 1989), which involved the crash of a Pan Am airline flight.  Two reports were at issue:  the "Hudson report," prepared by the Federal Aviation Administration on Pan Am's safety record and procedures, and the "Thomas report," prepared by Pan Am itself "on Pan Am's safety record and problems."  *Id.* at 816.  The district court had admitted the

21

FAA's Hudson report under Rule 803(8).  *Id.*  In affirming that decision, the Ninth Circuit took it as given that an FAA report was the report of a public office.  *Id.*  And it was equally obvious that the Thomas report was not, since Pan Am was a private company that prepared its own report.  And so the district court admitted that report as admissions of a party opponent, which the Ninth Circuit affirmed.  *Id.*

Many of the cases Sullivan cites are similar:  there was no question that reports qualified as public records, and so the courts skipped ahead to the question of whether the reports' findings were the result of authorized investigations and whether the reports were trustworthy.  *See, e.g.*, *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 157 (1988) (considering a report prepared by a Lieutenant Commander "on order of the training squadron's commanding officer and pursuant to authority granted in the Manual of the Judge Advocate General"); *EQT Prod. Co. v. Terra Servs., LLC*, No. CV 14-0153, 2018 WL 5668170, at *6 (W.D. Pa. Aug., 2, 2018) (considering adjudication of a state environmental hearing board); *In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 237-41 (E.D.N.Y. 2009) (considering

opinion and decision of the Superintendent of Insurance of the State of New York).

2. But it is very much a question here whether the report of a probate court special administrator qualifies as the record or document of a public office. And Loden argues that Murakami's report does not fit that category. He explains that under Hawaiʻi law, a probate court may appoint either a master or a special administrator. And while a master is appointed to "serve as a representative of the court" under Hawaiʻi Probate Rule 28, a special administrator is not. The task of a special administrator is to act on behalf of the estate, rather than as a representative of the court. Hawaiʻi Probate Rule 56 ("An interested person may seek appointment of a special administrator where necessary to preserve the estate or to secure its proper administration").

Sullivan does not dispute that a special administrator differs from a master in these ways, but she argues that Murakami should still be viewed as having spoken on behalf of the probate court when he prepared his report. She points to the fact that Murakami was appointed by the probate

court and given specific investigative tasks.  But neither of these facts is

sufficient to render Murakami a judicial officer or to make his report a

record or document of the probate court itself.  Courts regularly appoint

lawyers, paralegals, and other professionals to perform needed roles on

behalf of litigants.  The mere fact of court appointment does not mean that

those professionals have been authorized to speak on behalf of the court.

Nor does the fact that the probate court instructed Murakami to investigate

the reliability of Loden's appraisals mean that the results of that

investigation may be fairly attributed to the probate court.  Had Murakami

been appointed as a master, designated to "serve as a representative of the

court," then it might be a closer call.  Hawaiʻi Probate Rule 28.  But

Murakami was appointed as special administrator.  And as Loden

persuasively explains, a special administrator acts on behalf of the estate,

not for the court.

It is possible that the report could become the record or document of

the probate court if the court were to adopt it.  As the Ninth Circuit has

explained, "where a staff report is submitted to a commission or other

public agency charged with making formal findings, only those factual statements from the staff reports that are approved and adopted by the agency will qualify as 803(8)(C) findings." *Brown v. Sierra Nevada Mem.'l Miners Hosp.*, 849 F.2d 1186, 1189 (9th Cir. 1988) (cleaned up).  But first, Murakami is not a staff member of the probate court.  And second, Sullivan does not suggest that the probate court has done anything to adopt Murakami's report.  To the contrary, Murakami himself testified that nothing in his report was binding upon the probate court, and he also stated that "even if [he were] a master, it wouldn't be binding."  ECF No. 191-4, at PageID.2876.  And then Murakami went on to say that he was "not aware of any written order" saying that his "report is adopted as the findings of this court."  *Id.* at PageID.2877.

Sullivan points to cases in which public appointees' reports were treated as the records or documents of public offices.  But those cases are inapposite.  In *Gilbrook v. City of Westminster*, a city council appointed citizens to serve on a Financial Review Committee (FRC) to review the city's budget, and the FRC then produced an interim report with

recommendations.  177 F.3d 839, 848 (9th Cir. 1999).  The Ninth Circuit affirmed the admission of this report as a public record, but it did not consider whether the FRC was speaking on behalf of the city council or merely making a recommendation that could not be ascribed to the city council itself.  The issues presented were, instead, whether the report was sufficiently trustworthy and whether its information was relevant.  *Id.* at 858-59.  The *Gilbrook* decision therefore cannot be taken to resolve an issue it did not consider.

Sullivan also relies on *S.E.C. v. Drexel Burnham Lambert, Inc.*, which involved court-appointed directors who did not "constitute a traditional 'public office or agency.'"  837 F. Supp. 587, 614 (S.D.N.Y. 1993).  The court there concluded that "their reports nonetheless carry the same guaranties of trustworthiness as those expressly contemplated by the rule and should be admitted on the same basis."  *Id.*  Those guaranties of trustworthiness flow from the assumption "that an administrative body's findings may be assumed to be trustworthy," an assumption that "has substantially diminished force when extended to the sources outside the investigative

26

agency from which the agency culls the information for its report." *Brown*, 849 F.2d at 1190.  But the circumstances in *Drexel* were unique.  The "court-appointed directors" were "special advisors to the court" and "quasi-judicial officials."  837 F. Supp. at 603 (cleaned up).  The appointing judge stated that they were "fulfilling a rather unique fiduciary responsibility beyond that of merely being another director of the corporation, in a sense serving under the direction and authority of this court in a dual capacity and as an officer of this Court."  *Id.* (cleaned up).  In other words, the court-appointed directors were acting as servants of the court—akin to the role of a master in Hawaiʻi probate court.  Murakami, it bears repeating, was not appointed as a master, but instead as special administrator.  Because he was acting on behalf of the estate, rather than on behalf of the court, his work does not inherently carry those guaranties of trustworthiness that ordinarily attend the work of public agencies.

Sullivan raised a final argument at the motion hearing:  that the position of special administrator itself might qualify as a "public office."  Under this reasoning, it would not matter whether Murakami spoke

authoritatively for the court, because he unquestionably spoke authoritatively for himself.  It is true that the advisory note to Rule 803(8) says that the "rule makes no distinction between federal and nonfederal offices and agencies."  Fed. R. Evid. 803(8) advisory committee's note to 1972 amendment.  But whether federal or nonfederal, the office must be a "public" one, and Murakami's position as special administrator does not fit that bill.  A "public office" is well understood to mean a "position whose occupant has legal authority to exercise a government's sovereign powers for a fixed period."  Black's Law Dictionary (12th ed. 2024).  As special administrator, Murakami did not exercise the court's authority, but rather stepped into the shoes of the personal representative for the limited purpose of considering Sullivan's claim against Loden.  And that role does not bear the indicia of trustworthiness that ordinarily attend the work of a public agency exercising the sovereign's powers.[5]

---

[5]    Because the Court concludes that Murakami's report does not qualify as the record or finding of a public office, it need not resolve whether Loden has adequately overcome the presumption of trustworthiness that ordinarily applies to reports prepared by public offices.

For these reasons, the Court concludes that Murakami's report is not admissible as a public report under Rule 803(8).

**D.    Murakami's Report is Not Admissible under the Residual Exception in Federal Rule of Evidence 807**

As a final salvo, Sullivan argues that Murakami's report should be admitted under the "catch-all" or residual exception in Federal Rule of Evidence 807.  Rule 807 has two requirements for treating an out-of-court statement as non-hearsay:  (1) the statement must be "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement"; and (2) the statement must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid. 807(a)(1) & (2).  The Ninth Circuit has cautioned that this rule "is not to be used as a new and broad hearsay exception, but rather is to be used rarely and in exceptional circumstances." *Fong v. Am. Airlines, Inc.*, 626 F.2d 759, 763 (9th Cir. 1980).

Sullivan has not met her burden of showing that rare and exceptional circumstances exist here.  With respect to guarantees of trustworthiness, as noted above, Murakami's report cannot fairly be viewed as the work product of the probate court, and it therefore does not benefit from the presumption of trustworthiness that ordinarily attends the work of public agencies.  Nor is Murakami's work sufficiently tethered to the probate court—like the quasi-judicial officers in *Drexel* were found to be—such that a sufficient degree of trustworthiness might be imputed to the work.  And there is no other reason to conclude that Murakami's report benefits from any unusual degree of credibility.  After all, as explained above, Murakami largely relied on the expertise of others to prepare his report.

Nor has Sullivan met her burden of showing that she is unable to obtain more probative evidence through reasonable efforts.  The current record suggests the opposite.  For instance, Sullivan has acknowledged that she intends to call other valuation experts at the trial, and that those experts will also testify that Loden's appraisals were unreliable.  ECF No. 191, at PageID.2829 (explaining that Richard Campbell and Bryce Geyer

have "opined that Loden breached the standard of care for estate planning attorneys and did not follow appraisal standards").  The Court has no occasion here to resolve whether any of those other witnesses are properly qualified to testify.  But because other available witnesses exist, Sullivan has not met her burden to show that there is some extraordinary or pressing need to present Murakami's testimony.

The Court therefore declines to admit Murakami's report under the residual exception in Rule 807.

*     *     *

One final matter remains.  In her briefing and at the hearing on this motion, Sullivan argued that even if Murakami is not allowed to offer his opinions about the reliability of Loden's appraisals (the subject of Loden's present motion), Murakami should still be permitted to testify as to certain background matters, because he is a "part of the larger factual history that, you know, is part of Plaintiff's case."  ECF No. 191-4, at PageID.2903. Those facts include, presumably, Loden's conflict of interest and refusal to voluntarily appoint a special administrator, the ICA's eventual decision

requiring that appointment, and the probate court's appointment of Murakami.

But even if those facts are relevant to Sullivan's claims (which the Court does not resolve here), it is unclear why Murakami's testimony would be necessary to establish them. Many of those matters are public records and are suitable for stipulations or possibly even judicial notice. And against that backdrop, it is possible that any probative value of Murakami's testimony would be substantially outweighed by the risk of undue prejudice. That prejudice includes the danger that the jury would consider Murakami's testimony to be somehow endorsed by the probate court.

Nonetheless, the Court does not resolve this issue because it was not raised in Loden's Motion *in Limine* No. 1.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant's Motion *in Limine* No. 1. And because the contents of Exhibit A to Plaintiff's

opposition would not alter this ruling, the Court STRIKES Exhibit A from

the opposition and DENIES Plaintiff's motion to seal Exhibit A as moot.

IT IS SO ORDERED.

DATED:  October 2, 2024, at Honolulu, Hawai‘i.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

Civil No. 21-00123 MWJS-RT, *Colleen H.A. Sullivan v. Elliot H. Loden*;
ORDER GRANTING DEFENDANT'S MOTION IN LIMINE NO. 1